## SYMONS v. 10,466 BARRELS OF CEMENT.

### (District Court, W. D. Washington, N. D. April 27, 1912.)

### No. 3,608.

**1. Shipping (§ 106\*)—Bill of Lading—Effect—Freight—Weight of Cargo.**

The estimated weight of a cargo stated in bills of lading prepared by the shipper and signed by the master constitutes an agreement binding on the parties for the purpose of computing freight, unless impeached by proof of a difference in the actual weight.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 225, 226, 414–419; Dec. Dig. § 106.\*]

**2. Shipping (§ 154\*)—Ship's Lien—Expense of Preserving Cargo.**

A ship is responsible for the preservation of the cargo from the time of receiving it until it is delivered, and the captain has authority to incur any expense necessary to the fulfillment of that obligation, and the ship is entitled to a lien therefor.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 226, 516–520; Dec. Dig. § 154.\*]

**3. Shipping (§ 177\*)—Charter—Demurrage.**

A ship *held* entitled to demurrage from a charterer for delay in discharging caused by lack of space on the wharf for cargo as fast as she was ready to deliver it, and for her being displaced to make room for another vessel.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 576–582, 584; Dec. Dig. § 177.\*

Demurrage, see note to Harrison v. Smith, 14 C. C. A. 657; Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.]

In Admiralty. Suit by T. R. Symons, master of the British bark Port Caledonia, against 10,466 Barrels of Cement, to enforce a lien for freight, demurrage, and expenses claimed under a contract of affreightment. Decree for libelant.

The British bark Port Caledonia was chartered for a voyage from Antwerp to Seattle and Tacoma. The provisions of the charter party relevant to the questions to be decided are that a full and complete cargo of which at least three-fourths should be cement in barrels should be carried; the cargo to be brought to and taken from alongside of the vessel at charterer's risk and expense; the shipmaster to sign bills of lading, as presented, without prejudice to the charter party; the vessel, when loaded, to proceed with dispatch to Tacoma and Seattle, Wash, to discharge at any wharf or place delivering the cargo there as directed; half cost of weighing, not exceeding 6½ cents per ton, to be paid by vessel on any cargo that may be actually weighed at port of discharge; freight to be paid at the rate of 20 shillings per ton of 2,240 pounds delivered on final and true delivery of the cargo at port of discharge, payable in United States gold coin at the rate of $4.80 to the pound sterling; vessel to be discharged at an average speed of not less than 150 tons per weather working day after vessel is in berth; all days on demurrage, if any, to be paid for at the rate of 3 pence per net register ton per day.

---

\*For other cases see same topic & § number in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Most of the cargo carried was cement. Bills of lading prepared by the charterer's agent were signed by the captain of the ship, specifying the number of barrels and the weight and the amount to be paid for the carriage thereof, and containing stipulations that the freight should be paid on delivery at the rate of exchange of $4.85 per pound sterling, and that the ship should not be liable for leakage, breakage, loss, or damage by heating, sweat, rust, or decay, unless occasioned by improper stowage. The vessel made the voyage without any unusual occurrence and commenced discharging at Seattle October 26, 1907, and finished discharging at Tacoma, December 20th, and demurrage is demanded for 11½ days in excess of the stipulated lay days. A large number of the barrels containing cement were found to be unfit for handling by reason of shrinkage of the staves, loosening of the hoops, and dropping out of the heads. Some of the damaged barrels were delivered upon the wharf, and the wharfinger protested against receiving the cargo in bad condition. After a delay of several days, the damaged barrels remaining in the ship were recoopered by the ship's crew and a man from shore hired by the captain. The libelant's claim against the cargo of cement includes the three following items: $505.20 balance of freight; $1,549.74 demurrage; $100 expense of recoopering damaged barrels. To protect this claim, part of the cement was stored in a warehouse subject to the carrier's lien and to enforce said claim this suit was instituted. The third paragraph of the libel reads as follows: "That, upon the execution of said charter party, said bark proceeded to loading berth at Antwerp, and then loaded a cargo composed of general merchandise shipped by various parties, and 9,684 barrels of Elsa brand, and 10,093 barrels of Bise brand, of cement, shipped by Alex. De Groote & Co., as agent of the charterer, for which cargo the master signed bills of lading as presented, and particularly signed bills of lading for said cement presented by Alex. De Groote & Co. as agent of charterer, wherein the weight of said cement was represented by said charterer to be 3,487,330 kilos." The response to this in the answer is in the following words: "Claimant admits article 3 of said libel, save and except it denies that the weight of said cement so shipped on said vessel was 3,487,330 kilos." The libel also avers that all of the cargo received on board the vessel at Antwerp was discharged at Seattle and Tacoma, and this is not controverted by the answer. The libel also avers that a balance of the freight earned, amounting to $505.-20, remains unpaid. The answer denies the amount, and avers the true amount remaining unpaid to be $77.46, which, with the interest thereon, has been deposited in the registry of the court for the libelant. The libel also avers detention of the ship by default of the charterer, the bad condition of part of the cargo due to breakage and leakage of the barrels not caused by bad stowage, and an expense of $100 incurred for recoopering, and as to these matters the answer makes an issue.

Ira A. Campbell and Bruce Shorts, for libelant.

Williams, Wood & Linthicum, Isaac D. Hunt, and S. G. Murray, for claimant.

HANFORD, District Judge (after stating the facts as above). The real point of difference between the parties respecting the amount of freight earned and the true balance due to the libelant is in the discrepancy between the weight of the cement specified in the bills of lading and the estimated weight of the cement discharged upon which duty was paid. The court construes the charter party and the bills of lading together as constituting the contract by which the rights of the parties are to be adjudicated. In the written arguments submitted I find a useless contention as to whether the amount of freight in American money should be computed at the rate of exchange fixed by the charter party, viz., $4.80 per pound sterling, or the rate specified in the bills of lading, which is $4.85 per pound sterling. This

is not important, for the reason that according to the libelant's testimony the total weight of the entire cargo was 3,857 tons, the total amount claimed to have been earned is $18,513.94, and payments on account which he credited amount in the aggregate to $18,008.74, the difference being $505.20, which is the balance sued for. This is only 34 cents in excess of the true amount computed at the rate of $4.80 per pound sterling. "De minimis non curat lex."

[1] The bills of lading were prepared by the charterer's agent and presented to the captain for signature, and, when signed, constituted a valid agreement as to the estimated weight of the cement, binding upon the parties, unless impeached by proof of a difference in the actual weight, which could only be ascertained by weighing the entire consignment or by a subsequent agreement adopting a different estimate. It is true that the bills of lading show the estimated weight of the cement received by the ship and the freight was to be paid only upon the weight of cement delivered at the port of destination, but the pleadings admit that all of the cement received by the ship at Antwerp was discharged at Seattle and Tacoma, and no claim has been made for short delivery. The respondent relies upon customhouse certificates showing the estimated weight of the cement upon which duty was paid, but there is no competent evidence to establish as a fact that the estimate made by the customs officers was more nearly accurate than the estimate which the parties agreed to by the signing and acceptance of the bills of lading. Therefore the court finds the weight of the cargo to have been 3,857 tons, and that the balance due to the libelant on account of freight earned is $504.86.

The respondent contends that the evidence does not disclose the cause of the damaged condition of part of the cargo, and that the burden of proof rests upon the libelant to overcome the presumption arising from proof that the barrels were in good condition when received by the ship by proving that the damage was caused by a fault for which the charterer is responsible. The court finds, however, that the evidence does prove that the cargo was well stowed, and that the breakages and leakage were the natural consequences of shrinkage of the barrel staves after the cargo had been stowed. Whatever loss was caused thereby and the expenses of reconditioning the barrels to make them fit for handling is to be born by the charterer and not by the ship.

[2] A ship is responsible for the preservation of the cargo from the time of receiving it until it is discharged and her captain has authority to incur any expense necessary to the fulfillment of that obligation, and the ship's lien upon the cargo includes such necessary expenses if rightfully chargeable against it. In this case it was the right and duty of the libelant to recooper the barrels on board the vessel, and to charge the expense against the cargo, because that was necessary to minimize the loss by leakage, and it would be unjust to allow demurrage during the period of his delay in performance of that duty.

[3] There was delay caused by an excessive accumulation of matter upon the wharf and lack of space to receive cargo when the ship

was ready to deliver it, and by displacing the vessel in her berth to make room for another vessel, and for that delay the libelant is entitled to demurrage. I consider that demurrage at the rate specified in the charter party for five days time is justly chargeable, for which the ship is entitled to a lien, and it will be decreed accordingly.

The evidence proves that there was an actual expense amounting to $25 for recoopering which the libelant paid, and most of the work of recoopering was done by the crew of the ship. I consider that the claim of $100 for reimbursement and compensation is reasonable, and that item is allowed.